UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ANTHONY TAYLOR,                                                          Plaintiff,

v.                                              Civil Action No. 3:17-cv-696-DJH-CHL

JON DAVIES et al.,                                                    Defendants.

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony Taylor alleges that he experienced racial harassment at work and that his employer fired him because he reported unsafe working conditions.  He asserts claims of discrimination, retaliation, and wrongful discharge against Defendants Jon Davies; Kevin Harl; Complete Demolition Services (CDS); and Complete Environmental Services, LLC (CES). (Docket No. 56)  Defendants move for summary judgment on all claims.  (D.N. 66)  For the reasons explained below, the Court will grant Defendants' motion in part.

### I.

CDS hired Taylor in the spring of 2015 as a laborer.  (D.N. 66, PageID # 347; D.N. 70-1, PageID # 399)  Taylor worked for both CDS and CES during his employment.  (*See* D.N. 66, PageID # 347–48; D.N. 70-1, PageID # 408)  Taylor, who is African-American, claims that while he was working on an assignment in Senora, Kentucky, in the summer of 2015, his supervisor at the time, Kevin Harl, made numerous racist comments.  (D.N. 70-1, PageID # 400–402)  Taylor reported Harl's behavior to Tony Rodgers, partial owner of CES and one of Taylor's supervisors; and Jonathan Davies, head of CDS and another partial owner of CES.  (D.N. 70-1, PageID # 401; D.N. 70-4, PageID # 424)  Harl and Taylor were subsequently separated at work.  (*See* D.N. 66,

1

PageID # 347; D.N. 70-1, PageID # 402)  According to Taylor, Harl continued to harass him. (D.N. 70-1, PageID #  403–05)

Over the next few months, Taylor received asbestos training and became an asbestos supervisor.  (D.N. 66, PageID # 347–48; D.N. 70-1, PageID # 402–03)  In March 2016, Taylor was assigned to work as an asbestos supervisor at a job site for CES.  (D.N. 66, PageID # 348; D.N. 70-1, PageID # 405)  Taylor claims that during this assignment the employees on his team repeatedly took actions that made the workplace unsafe, such as dropping siding pieces to the ground in a manner that caused asbestos fibers to be released into the air.  (D.N. 70-1, PageID # 405–07)  Taylor's team refused to follow his instructions, and Taylor reported the unsafe conditions to Rodgers and Davies multiple times.  (*Id.*)  On the third day on the project—March 9, 2016—when his team once again ignored his instructions, Taylor left the job site and reported the incident to Rodgers.  (D.N. 70-1, PageID # 407)  Taylor alleges that Rodgers fired him in response (*id.*, PageID # 407–08); Defendants contend that Taylor quit voluntarily.  (D.N. 66, PageID # 352–53)  After receiving his right-to-sue letter from the Equal Employment Opportunity Commission Taylor filed this lawsuit, asserting claims of discrimination and retaliation in violation of Title VII and the Kentucky Civil Rights Act, and wrongful discharge in violation of Kentucky public policy.  (*See* D.N. 56; D.N. 66, PageID # 349)

## II.

Before the Court may grant a motion for summary judgment, it must find that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying the portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party

satisfies this burden, the nonmoving party must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The evidence of the nonmoving party is to be believed, *id*. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in that party's favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Nevertheless, the nonmoving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Id.* at 586. Instead, the Federal Rules of Civil Procedure require the nonmovant to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

A.      **Individual Defendants**

Defendants argue that Taylor's claims against Davies and Harl should be dismissed because "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." (D.N. 66, PageID # 350 (citing *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997))) In response, Taylor argues only that "Davies is individually liable for retaliation under Kentucky's anti-retaliation law." (D.N. 70, PageID # 395) The Court therefore finds that Taylor has abandoned his claims against the individual defendants, aside from his retaliation claim against Davies. *See Brown v. VHS of Mich.,*

3

*Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases) ("[The Sixth Circuit's] jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *see also Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 759–60 (E.D. Ky. 2019) (quoting *Rouse v. Caruso*, No. 6-cv-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011)).

As for Taylor's retaliation claim, Taylor correctly argues that Davies can be held liable as an individual under Kentucky law. *See Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 794 (6th Cir. 2000) ("The Kentucky retaliation statute [§ 344.280] plainly permits the imposition of liability on individuals."). Defendants are therefore not entitled to summary judgment on Taylor's retaliation claim against Davies.

**B.    Discrimination (Counts I and III)**

Taylor asserts that Defendants discriminated against him by (1) paying him less than his white colleagues, (2) creating a hostile work environment due to racial harassment, and (3) discharging him. (*See* D.N. 56, PageID # 317) "The Kentucky Civil Rights Act, [Ky. Rev. Stat.] § 344.040, mirrors Title VII of the Civil Rights Act of 1964, and discrimination claims brought under the KCRA are analyzed the same way as those brought under Title VII." *Beatty v. Frito-Lay, Inc.*, 429 F. Supp. 3d 342, 347 (E.D. Ky. 2019), *appeal dismissed*, No. 20-5041, 2020 WL 1856400 (6th Cir. Feb. 25, 2020) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000)). Defendants seek summary judgment on all of Taylor's discrimination claims.

**1.    Lower Pay**

"In order to establish a prima facie case of pay discrimination under Title VII, the plaintiff must show that the employer paid lower wages to employees of the protected class than those outside the class, for equal work." *Gee v. Liebert Corp.*, 58 F. App'x 149, 153 (6th Cir. 2003)

(citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). Equal work requires "substantial equality of skill, effort, responsibility and working conditions." *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981) (citing *Schultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3rd Cir. 1970)). Defendants argue that Taylor has failed to demonstrate that he received lower pay "than similarly situated white employees" because the 2015 payroll shows that Taylor was paid "a higher wage than some of his white co-workers." (D.N. 66, PageID # 350) Specifically, Defendants compare Taylor, who was paid $12 per hour as a laborer and $13 per hour as a supervisor, to Charles Longnecker, a white employee who made $10 per hour as a laborer and $12 per hour as a supervisor. (D.N. 66, PageID # 351; *see* D.N. 66-11, PageID # 371; 66-12, PageID # 372) But Defendants offer no information to demonstrate that Taylor and Longnecker performed equal work. Absent evidence that the work performed by both men required substantially the same "skill, effort, responsibility and working conditions," it is irrelevant that Longnecker earned less than Taylor. *Odomes*, 653 F.2d at 250; *see Beck-Wilson v. Principi*, 441 F.3d 353, 362 (6th Cir. 2006) (citing *Brennan v. Owensboro–Daviess Cnty. Hosp.*, 523 F.2d 1013, 1017 & n. 7 (6th Cir. 1975)) ("[O]ur focus is on actual job requirements and duties, rather than job classifications or titles."). And the 2015 payroll form submitted by Defendants shows that Taylor did earn a lower hourly rate than some white employees, such as Daniel Phillips and Kevin Harl. (*See* D.N. 66-11, PageID # 371; 66-12, PageID # 372) The issue of whether Taylor received a lower pay rate than some of his white co-workers thus remains disputed, and Defendants are therefore not entitled to summary judgment on this claim. *See Anderson*, 477 U.S. at 248.

### 2. Hostile Work Environment

Establishing a prima facie case of a racially hostile work environment requires a plaintiff to demonstrate "(1) [he] was a member of a protected class; (2) [he] was subjected to unwelcome

racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with [his] work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)).  Harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment" qualifies as hostile. *Williams v. CSX Transp. Co.*, 643 F.3d 502, 512 (6th Cir. 2011) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  The Court considers the totality of the harassment, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23).

Taylor's hostile-work-environment claim rests on the behavior of Harl.  According to Taylor's declaration, CDS required Taylor to stay at Harl's home while working on the Senora project in the summer of 2015.  (D.N. 70-1, PageID # 400)  On Taylor's first evening at Harl's house, Harl told him that "he did not serve 'fried chicken, cornbread, or watermelon' at his house." (*Id.*)  While they were sitting at the dinner table together that evening, Harl "petted his black Labrador dog and made a comment to [Taylor], 'now I have two things that match in my house,' referring to [Taylor] and [Harl's] dog." (*Id.*)  Later that night, Harl banged on the bathroom door while Taylor showered and told Taylor "that [he] had taken long enough," despite the fact that Taylor's "white co-workers were allowed to take at least five minutes each for their showers." (*Id.*, PageID # 401)

At the job site the next day, Harl, while conversing with a local pastor, "looked over at [Taylor] working and said to the pastor, 'I've always wanted my own slave.'" (*Id.*)  On that same

day, Taylor reported the incidents to Rodgers "with instructions to tell Jon Davies." (*Id.*) Later that week, Harl "shot [Taylor] in the right foot using an air-powered pellet gun at close range" and "laughed it off." (*Id.*) Taylor then met with Davies and Rodgers and informed them of Harl's racist remarks and the shower incident. (*Id.*) Nevertheless, during the second week of the Senora project CDS continued to require Taylor to stay at Harl's house, and Harl continued to supervise him. Harl "would be short with [Taylor] and seemed like he did not want [Taylor] there." (*Id.*) When the Senora project ended, Harl dropped Taylor off at Taylor's home, and as Harl was leaving he "said to himself, but loud enough for [Taylor] and [Taylor's] daughter to hear, 'I hate n******.'" (*Id.*) Taylor and a co-worker who was present at the time, Eric Breaux, reported the incident to Tony Rodgers later that day. (*Id.*, PageID # 402) Rodgers suggested that Taylor rent a car from him so that Taylor would no longer need to ride to work with Harl, and Taylor agreed. (*Id.*)

According to Taylor, Harl's harassment continued that fall. In November 2015, Taylor took on the role of asbestos supervisor at a site in Louisville. (*Id.*, PageID # 403) Harl was supervising the demolition crew at the same site and "refused to have his crew remove the debris" lying over asbestos tiles that Taylor's team was tasked with abating and removing. (*Id.*) Although Taylor complained to Davies, Davies did not discipline Harl, and instead directed Taylor to work on another floor. (*Id.*) Later, "someone kept removing the asbestos signs and calling in complaints to Louisville Metro Air Pollution Control District," and after interviewing crew members, an Air Pollution District employee informed Taylor that she believed Harl had been calling in the complaints. (*Id.*, PageID # 404) Physical altercations at the job site followed—Harl yelled at Taylor and slapped him "hard enough to leave his handprint mark on [Taylor's] skin," which Taylor reported to Rodgers and Davies; Harl also pushed Taylor, causing Taylor to spill coffee on

7

his own hand, which Taylor again reported to Davies.  (*Id.*)  To Taylor's knowledge, "no remedial action was taken again [Harl]," and the harassment continued: Harl said "black motherf*****" when Taylor refused to join his demolition crew; Harl refused Taylor access to necessary tools on two occasions; and Harl "slit a hole in a plastic sheet which [Taylor] had set up to contain the asbestos, [thereby] 'breaking containment.'"  (*Id.*, PageID # 405)[1]

Defendants dispute many of the assertions in Taylor's declaration and submit various affidavits containing contrary narratives.  (*See* D.N. 75, PageID # 456–57; D.N. 75-1; D.N. 75-2; D.N. 75-3; D.N. 75-4; D.N. 75-5)  For example, Defendants argue that Taylor "manipulated" the pellet-gun shooting incident "from the original scenario of friends having fun," and that "the reference to fried chicken for dinner" was made because Harl's wife "actually made fried chicken for dinner."  (D.N. 75, PageID # 456–57)  Given the parties' contradicting evidence regarding Harl's conduct, Defendants have failed to demonstrate the absence of a genuine issue of material fact as to the alleged discrimination that Taylor experienced at work.  And Taylor's declaration details frequent and severe discriminatory conduct that escalated to physical assaults and interfered with his ability to do his job.  For this reason, "[t]he evidence of a racially hostile work environment significantly affecting [Taylor's] ability to perform his job is sufficient to warrant consideration

---

[1] Not all of Harl's alleged conduct is explicitly race-based.  But "even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American . . . . [A] showing of the use of racial epithets in a work environment may 'create an inference that racial animus motivated other conduct as well.'"  *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999)) (internal citation omitted); *see also Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) (*"*Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify.").  Since, at the summary judgment stage, the Court draws all reasonable inferences in the nonmoving party's favor, the Court considers all of Harl's alleged behavior in assessing Taylor's hostile environment claim.  *See Matsushita*, 475 U.S. at 587.

by a jury." *Hafford*, 183 F.3d at 513 (holding summary judgment precluded where employee's "supervisors and fellow [co-workers] engaged in a pattern of racial harassment consisting of not only racial slurs, but also physical threats"); *see Yehia v. Mich. Dep't of Corr.*, No. 19-12019, 2020 WL 6393898, at *15 (E.D. Mich. Nov. 2, 2020), *reconsideration denied*, No. 19-12019, 2020 WL 7225976 (E.D. Mich. Dec. 8, 2020) (noting that "the [c]ourt does not make credibility judgments at the summary judgment phase" and that "[p]laintiff's deposition testimony alone is likely sufficient to establish the severe or pervasive element" where plaintiff testified as to "very frequent" verbal harassment and physically humiliating conduct); *Equal Emp't Opportunity Comm'n v. Ralph Jones Sheet Metal, Inc.*, 777 F. Supp. 2d 1119, 1123–24 (W.D. Tenn. 2011) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)) ("Plaintiff has demonstrated a genuine issue of fact [as to the existence of a hostile environment] by producing direct evidence that [a supervisor] used the word 'n*****' on numerous occasions, and directed its use at particular employees with a view to demeaning, insulting, and degrading them . . . . 'Perhaps no single act can more quickly create an abusive working environment than the use of an unambiguously racial epithet such as "n*****."'"); *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 834–35 (E.D. Mich. 2009) ("The record establishes a substantial question of material fact as to whether the work environment . . . was hostile to the plaintiffs because of their race" where employee hung a noose in the office, black employees were on separate occasions called "porch monkey" and "Mr. Bojangles," racist graffiti was found on a door, and a white-supremacist flyer was found in the lunchroom).

Since Taylor has provided sufficient evidence to preclude summary judgment for Defendants on the hostile-work-environment element of his discrimination claim, the Court considers the final element of this claim—employer liability. *See Barrett*, 556 F.3d at 515 (citing

9

*Hafford*, 183 F.3d at 512)  When an employee is harassed by his supervisor, his employer "is subject to vicarious liability." *Jackson*, 191 F.3d at 659 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).  In the case of a harassing co-worker, "[a]n employer is liable if it 'knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action.'"  *Hafford*, 183 F.3d at 513 (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 (6th Cir. 1994)).

"[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (quoting *Ellerth*, 524 U.S. at 761).  Defendants argue that Harl does not qualify as Taylor's supervisor because "Harl did not have the authority to make any decisions relating to [Taylor's] pay, schedule, promotion, or termination."  (D.N. 66, PageID # 352)  But according to Taylor's declaration, Harl "was physically present at the job sites where [Taylor] worked, supervised the work, and set and assigned work responsibilities"; he also "scheduled and approved meal and rest breaks" and "had control over all [of Taylor's] work activities."  (D.N. 70-1, 399–400)  The facts in Taylor's declaration create a genuine issue as to whether Harl was empowered to significantly alter Taylor's

responsibilities or benefits, and therefore Defendants are not entitled to summary judgment on Harl's hostile-work-environment claim.[2] [3]

### 3.    Discharge

"Title VII deems unlawful an employer's decision 'to discharge any individual . . . because of such individual's race.'"  *Jackson*, 191 F.3d at 658 (quoting 42 U.S.C. § 2000e-2(a)(1)). Defendants argue that Taylor's "claim that he was discharged based on his race is factually unsupported," that Taylor voluntarily quit his employment, and that "[t]here is zero evidence that Taylor's decision to quit his position had anything to do with race."  (D.N. 66, PageID # 352–53) In response, Taylor argues that "[t]he question of whether [he] was discharged or constructively discharged is one of disputed fact for the jury to decide."  (D.N. 70, PageID # 394)[4]

A plaintiff may not raise new claims or theories of recovery in response to a summary judgment motion.  *See Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 496 (6th Cir. 2019), *cert.*

---

[2] When an employer is liable on the basis of supervisory liability but the supervisor took no tangible employment action against the plaintiff, "an employer can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided."  *Vance*, 570 U.S. at 430; *see Hafford*, 183 F.3d at 513.  "This 'affirmative defense encompasses active and inactive components: before the employer can benefit from the defense, it must prove both that it *acted* reasonably in preventing and correcting harassment and that the victimized employee unreasonably *failed to act* by not utilizing complaint opportunities.'"  *Yehia*, 2020 WL 6393898 at *16 (quoting *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349 (6th Cir. 2005)).  Although Defendants argue cursorily that they "exercised reasonable care in dealing with the complaint of harassment, by reprimanding [Harl] and separating [Harl] and [Taylor]" (D.N. 66, PageID # 352), they do not argue that Taylor unreasonably failed to utilize complaint opportunities.  Their affirmative defense thus fails on the second prong.

[3] Defendants' liability for Harl's conduct after Taylor became a supervisor himself and no longer worked under Harl—from November 2015 on—is properly considered under the standard for co-worker liability.  But since Defendants make no argument as to their liability under this standard, the Court does not consider this issue at present.

[4] It is unclear which of his discharge claims this portion of Taylor's response applies to.  The Court construes it as applying to all of Taylor's claims that are based on his discharge—i.e., both his retaliation and discrimination claims.

*denied*, 141 S. Ct. 162 (2020); *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citing *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 329 (6th Cir. 2006)).   As Taylor did not raise a claim of constructive discharge in his complaint, the Court will consider only his claim of actual discharge.[5]   The parties dispute whether Taylor was discharged.  *See infra* part II.D.  But even assuming that CDS/CES fired Taylor, Taylor has offered neither argument nor evidence showing that his discharge was because of his race.  Defendants are therefore entitled to summary judgment on this claim.

## C.      Retaliation (Counts II and IV)

"To establish a prima facie case of retaliation[,] a plaintiff must establish that: (1) [he] engaged in a protected activity; (2) [his] 'exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.'"[6] *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).   In regard to the third factor, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," a showing which "is less burdensome than what a plaintiff must demonstrate for a Title VII discrimination claim."   *Id.* at 776 (citations omitted).

---

[5] For the same reason, the Court will not consider Taylor's argument, raised for the first time in his response, that CDS/CES should be considered a single or joint employer.  (*See* D.N. 70, PageID # 392)

[6] "Retaliation claims under the KCRA are evaluated under the same standard [used] to evaluate federal Title VII claims."  *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014) (citing *Hamilton v. General Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009)).

Defendants argue that "there was no adverse employment action" here because "after [Taylor] registered his complaint about Harl, [Taylor] received: additional training; a promotion to supervisor with higher pay; and, the ability to work directly under his cousin, [Rodgers]." (D.N. 66, PageID # 353)  But according to Taylor, after he "charged Mr. Harl with harassment, [his] employer reassigned [him] to a floater position, which deprived [him] of vital on-the-job training needed to advance his career, including blueprint reading and lift operations." (D.N. 70, PageID # 392)  Taylor further explains in his declaration:

> I was reassigned to what I would call a 'floater' position, where I would work at different job sites as needed and under different supervisors . . . . The lack of consistency in supervision negatively affected the training I received.  Also, I had been working about forty hours per week before making my complaint; after I made my complaint, my hours were significantly reduced, some weeks to around twenty hours per week . . . . After I made my complaint, I did not have the same opportunities as my co-workers and I felt that my white co-workers received higher quality training.  For instance, [a co-worker] was trained to read blueprints, but I did not receive that training, even though I had expressed a desire to [Davies] to be trained on blueprints.  I also wanted to be trained on operating the lift, which I told to [Davies], but [Davies] trained [a co-worker] on that machine, not me.

(D.N. 70-1, PageID # 402)

In reply, Defendants argue that Taylor received a promotion to asbestos abatement supervisor and an accompanying pay raise, and that Taylor falsely argues his hours were reduced because "[t]he paystub submitted by [Taylor] . . . credits Taylor with a full forty-hour work-week plus overtime in February 2016." (D.N. 75, PageID # 455)  But according to Taylor, this promotion occurred in November 2015, months after he reported Harl's conduct; and the fact that Taylor worked one full week in February 2016 does not mean that his hours were not previously

or otherwise reduced, as Taylor stated in his declaration.[7]   This evidence creates a genuine issue of material fact because a "reasonable jury" could find, based on Taylor's declaration, that CDS/CES retaliated against Taylor by taking actions that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Anderson*, 477 U.S. at 252; *Rogers*, 897 F.3d at 776; *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) ("[T]o retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination."); *Kea v. Donahoe*, 119 F. Supp. 3d 723, 743 (E.D. Mich. 2015) ("Plaintiff has created a genuine issue of fact as to whether the vehicle restriction [restricting Plaintiff from driving company vehicle to lunch] constitutes an adverse action . . . . [Because] [a]ll he has to establish is that a reasonable employee would have found the vehicle restriction materially adverse such that it would deter them from complaining about discrimination in the future.").   Defendants therefore are not entitled to summary judgment on this claim.

D.      **Wrongful Discharge**

In a "wrongful discharge case, a plaintiff must show 'at a minimum that he was engaged in a statutorily protected activity, that he was discharged, and that there was a connection between the "protected activity" and the discharge.'" *Mitchell v. Coldstream Labs., Inc.*, 337 S.W.3d 642, 645 (Ky. Ct. App. 2010) (citing *Follett v. Gateway Regional Health System, Inc.*, 229 S.W.3d 925, 929 (Ky. Ct. App. 2007)).   "A claim for wrongful discharge can be based on an employee's failure or refusal to violate the law." *Id.* (citing *Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985)).

---

[7] Taylor submitted four paystubs from February 2016, one for each week of the month; of the four, only one shows that Taylor worked a forty-hour week.  (*See* D.N. 70-5, PageID # 425–28)

The parties here dispute the most basic element of this claim—whether Taylor was discharged.  Defendants argue that Taylor was not discharged because he "was told that he could work at a different job site, and refused."  (D.N. 66, PageID # 354)  In support of their position, Defendants submit a statement by one of Taylor's coworkers (D.N. 66-5, PageID # 361 ("[Taylor] called me . . . saying that we all was fired . . . I called Tony the next day . . . . He told me that we was not all fired . . . .")); text messages sent from Tony Rodgers to Anthony Taylor on March 14, 2016 (D.N. 66-6, PageID # 362–63 ("I told each and every one of you all, NOBODY WAS FIRED!! If you all don't choose to come to work then that's on you all."); and a decision by the Unemployment Division Insurance Appeals Branch, which concluded that Taylor "voluntarily quit suitable work without good cause attributable to the employment."  (D.N. 66-9, PageID # 366)  Defendants also submit Taylor's testimony from the unemployment benefits hearing, where Taylor stated: "[W]e lost our job . . . . Then six days later, [Rodgers told him] 'Man, look, you can come back.'"  (D.N. 66-10, PageID # 370)

Taylor asserts that he was fired, which he supports with his sworn declaration:

> I explained to [Rodgers] that I did not feel safe.  [Rodgers] then instructed me to turn in my shop keys and work truck.  I understood that I was being let go . . . . Later that day, on March 9, 2016, [Rodgers] came to my house and retrieved my shop keys and the company work truck.  This action was consistent with my understanding that my employment had been terminated by the company . . . I did not voluntarily quit my employment with CES or CDS . . . No one on behalf of CDS or CES asked me to return to work or told me that I had not been fired.  [Davies] never told me that I could come back to work.

(D.N. 70-1, PageID # 407–09)

This conflicting evidence creates a genuine issue of material fact, because a "a reasonable jury" could find, based on the facts asserted in Taylor's declaration, that CDS/CES discharged him

on March 9, 2016. *Anderson*, 477 U.S. at 252. Defendants are therefore not entitled to summary judgment on this claim.

**III.**

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)      Defendants' motion for summary judgment (D.N. 66) is **GRANTED** as to Taylor's discrimination claims based on his discharge (Counts I and III); all claims against Harl; and all claims against Davies, except for Taylor's Kentucky-law retaliation claim (Count IV). Those claims are **DISMISSED** with prejudice.

(2)      Defendants' motion is **DENIED** as to Taylor's discrimination claims based on lower pay and hostile work environment (Counts I and III); retaliation claims (Counts II and IV); and wrongful discharge claim (Count V). The Clerk of Court is **DIRECTED** to terminate Kevin Harl as a defendant in the record of this matter.

(3)      The matter will be set for trial by subsequent order.

March 29, 2021

**David J. Hale, Judge**
**United States District Court**
